# MILLER

*v.*

# THE UNITED STATES.

CRIMINAL LAW; PLEADING; GAMING TABLE; BOOK-MAKING ON
HORSE RACES; GAMING PLACE; STATUTORY CON-
STRUCTION; REPEAL.

1. Where a general demurrer is interposed to an indictment contain-
ing two counts, the demurrer is properly overruled if one of the
counts only is sufficient.

2. The definition of a gaming table contained in the act of Congress
of January 31, 1883 (22 Stat. 411) to more effectually suppress
gaming in this District, does not involve the ordinary mechanical
definition of a table, but depends for its statutory meaning upon
the means or contrivances adopted for playing the game.

3. Book-making on a horse race is a game of chance or gambling de-
vice or contrivance, within the meaning of the act of Congress
of January 31, 1883.

4. A book-maker's booth is a place for gaming within the meaning
of the act of Congress of January 31, 1883.

5. The acts of Congress of April 26, 1888 (25 Stat. 94), and March 2,
1891 (26 Stat. 824), relating to book-making and pool selling in
Washington and Georgetown, do not constitute a legislative
construction that book-making is not within the scope of the act
of Congress of January 31, 1883, relating to gaming in the Dis-
trict of Columbia, nor do they repeal the act of 1883 and furnish
a substitute therefor, so far as book-making is concerned.

6. Matter unnecessarily alleged in an indictment *held* to be surplusage
and not to vitiate the indictment.

No. 437.   Submitted March 7, 1895.   Decided March 18, 1895.

HEARING on an appeal by the defendant from an order
overruling a demurrer to an indictment for keeping a gam-
ing table and for keeping a certain place or booth for the
purpose of gaming, contrary to the Act of Congress of Jan-
uary 31, 1883. *Affirmed.*

The facts are stated in the opinion.

*Mr. Henry E. Davis* and *Mr. A. S. Worthington* for the appellant.

There are three acts of Congress that are supposed to bear upon the subject-matter of this indictment, viz : act of January 31, 1883 (22 Stat. 411); act of April 26, 1888 (25 Stat. 94), and act of March 2, 1891 (26 Stat. 824).

The appellant contends that the latter acts are either, first, a legislative construction that book-making is not within the scope of the first act, or, second, a repeal of the first act and substitute therefor so far as book-making is concerned. The argument in support of this contention falls naturally under the heads hereinafter indicated.

1. The intent of the legislature and the object it had in view in enacting a given law should always be sought, and when found should govern the construction and meaning of such law. *Edwards* v. *Dick,* 4 B. & Ald., 212, 214; *Griswold* v. *Ins. Co.,* 3 Cow. 89; *Canal Co.* v. *Railroad Co.,* 4 G. & J. 1, 152; *Pco.* v. *Ins. Co.,* 15 Johns. 358; *Frazier* v. *Warfield,* 13 Md. 279.

2. How the intent of the legislature is to be ascertained is well settled. It "may be collected from the cause or necessity of making the act or from foreign circumstances," or from the state of things at the time of the act as appearing to the legislature. *United States* v. *Railroad Co.,* 91 U. S. 72; *Platt* v. *Railroad Co.,* 99 U. S. 48; *Steamboat Co.* v. *Transportation Co.,* 18 N. J. Eq. 13.

In this connection those matters of which courts will take judicial notice may properly be considered. Courts will generally take notice of whatever ought to be generally known or generally ascertainable within the limits of their jurisdiction. *Brown* v. *Piper,* 91 U. S. 37; 1 Greenl. Ev., sec. 6; 12 Ency. of Law, 165. Courts are bound to know judicially facts of public history affecting the whole people, and also historical public sentiment as bearing upon the legislative intent in enacting a given statute. *Payner* v. *Treadwell,* 16 Cal. 220; *Stout* v. *Commrs.,* 107 Ind. 343. For

the purpose of construing a constitution or statute, courts may take judicial notice of everything which may affect the validity or meaning of such constitution or statute. *Topeka* v. *Gillett*, 32 Kan. 431. Courts will take judicial notice of the names of gambling games and devices, as " rondo," " faro bank," " billiard table," &c. *Barker* v. *State*, 12 Tex. 273 ; *Ward* v. *State*, 22 Ala. 43 ; *State* v. *Price*, 12 G. & J. 260.

3. In ascertaining the meaning of a statute, ·contemporaneous construction and legislative· construction will have great weight. *Packard* v. *Richardson*, 17 Mass. 122, 144 ; *Cohens* v. *Virginia*, 6 Wh. 264, 418. And a legislative construction of a statute will bind the courts as to all future transactions, and have great weight as to those that are past. *Stockdale* v. *Ins. Co.*, 20 Wall. 323 ; *Dequindre* v. *Williams*, 31 Ind. 444 ; *Mfg. Co.* v. *McCollock*, 24 Fed. Rep. 667. Even where the construction is by implication. *P. M. Genl.* v. *Early*, 12 Wh. 136. See also, *Drain Commr.* v. *Baxter*, 57 Mich. 127 ; *Pike* v. *Megoun*, 44 Mo. 491.

These principles apply as well to statutes *in pari materia* which are to be read together as one enactment. *United States* v. *Freeman*, 3 How. 556 ; *Alexander* v. *Alexandria*, 5 Cr. 1 ; *Cannon* v. *Vaughan*, 12 Tex. 399.

4. In many cases the title of an act is of great aid in its interpretation. ·*Fisher* v. *Blight*, 2 Cr. 358 ; *United States* v. *Palmer*, 3 Wh. 610, 631 ; *Holy Trinity Church* v. *United States*, 143 U. S. 457 ; *Bradford* v. *Jones*, 1 Md. 352 ; *State* v. *Archer*, 73 Md. 44, 61 ; *Field* v. *Gooding*, 106 Mass. 310; and see *United States* v. *Railroad Co.*, 91 U. S. 72 ; *Myer* v. *Car Co.*, 102 U. S. 1, 11 ; *Wilson* v. *Spaulding*, 19 Fed. Rep. 304; *Mining Co.* v. *So. Car.* 3, 144 U. S. 563. In the case at bar the titles of the three acts are highly instructive as to the meaning of Congress. The title of the first act is " An act more effectually to suppress gaming in the District of Columbia ;" that of the second is " An act to prevent any person or persons *in the cities of Washington and Georgetown* from making books and pools," &c. ; that of

the third is " An act to prevent book-making and pool-selling *in the District of Columbia.*" Either Congress meant to say that the first act did not embrace book-making, or it intended by the second act to provide a new law as to book-making in the cities of Washington and Georgetown ; and, finally by the third act to provide such new law as to the whole District.

5. While repeals by implication are said not to be favored, yet where a later law is clearly a substitute for an earlier the courts must give it effect as such. *Stirman* v. *State,* 21 Tex. 734 ; *Bartlet* v. *King,* 12 Mass. 537. If two statutes on the same subject are mutually repugnant and irreconcilable, the later act, without any repealing clause operates, in the absence of expressed intent to the contrary as a repeal of the earlier, but only *pro tanto* to the extent of the repugnancy. 23 Ency. of Law, 479 *et seq.* and cases ; *Harolds* v. *State,* 16 Tex. App. 157 ; *Com.* v. *Kelliher,* 12 Allen, 480. And this is especially true where the later statute is more particular and specific as to subject-matter in comparison with the earlier statute. *Isham* v. *Bennington,* 19 Vt. 240 ; *Petroleum Co.* v. *Lacey,* 63 N. Y. 422, 426. And more especially is it true where the later statute makes a change of penalty. *Nichols* v. *Squire,* 5 Pick. 168, 169; *State* v. *Whitworth,* 8 Port. (Ala.), 434; *Gormond* v. *Hammond,* 28 Ga. 85, 87, 88 ; *Rex* v. *Cator,* 4 Burr. 2026; *State* v. *Upchurch,* 9 Ired, 454; *Com.* v. *Davis,* 11 Gray, 48 ; *Buckalew* v. *Acherman,* 8 N. J. L. 48 ; *Flaherty* v. *Thomas* 12 Allen, 428.

6. A construction which is unreasonable or which would involve absurdity, inconsistency, injustice or inequitable consequences is to be avoided. *Holy Trinity Church* v. *United States,* 143 U. S. 460; *Att'y Gen'l* v. *Sillam,* 2 H. & C. 515 ; Potter's Dwarris, 197 ; *San Diego* v. *Granniss,* 77 Cal. 511, 516 ; 23 Encyc. of Law, 358 and notes ; *Lau Ow Bew* v. *United States,* 144 U. S. 47, 59 ; *Fusz* v. *Spannhurst,* 67 Mo. 256, 267 ; *Ryegate* v. *Wardboro,* 30 Vt. 746, 749 ; *Cannon* v. *Vaughan,* 12 Tex. 399, 402.

Tested by these principles, the indictment against the appellant is clearly bad in each count.

*Mr. A. A. Birney*, United States Attorney for the District of Columbia, for the United States.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case is brought into this court by an appeal from the judgment of the court below, rendered upon a demurrer interposed by the appellant, Frederick T. Miller, to an indictment against him for setting up or keeping a gaming table, and for keeping a certain place or booth for the purpose of gaming, contrary to the act of Congress of January 31, 1883.

The indictment contains two counts, framed under the act of 1883, the one count for setting up and keeping a gaming table, and the other for keeping a certain place, towit, a booth for the purpose of gaming, contrary to the act of Congress.

It is averred in the indictment that on the 1st of December, 1894, there was, at certain premises in the District of Columbia, commonly known as and called the Benning's race track, a certain event or contest called a running race of horses ; and, by the first count in the indictment, it is charged that at the time and place aforesaid, the place being within the District of Columbia but distant more than one mile from the boundaries of the cities of Washington and Georgetown, the defendant did set up and keep a certain *gaming table*, towit, the game, device and contrivance called book-making on the race aforesaid, the said game, device and contrivance being then and there a game, device and contrivance at which money was then and there, and before the said race took place, bet and wagered by divers persons then and there present, upon the result of the said race, and which said game, device and contrivance called

book-making on the said race, was then and there a gambling device, adapted, devised and designed for the purpose of a game of chance for money, &c.

By the second count it is charged that the defendant at the time and place aforesaid, the place being more than one mile from the boundaries of the cities of Washington and Georgetown, *did set up and keep a place* for the purpose of gaming, to-wit, *a booth*, and at such place for gaming, for lucre and gain, unlawfully and injuriously did cause and procure divers idle and evil disposed persons to come together to gamble and bet at and upon the game, device and contrivance in the first count of this presentment mentioned, towit, the game, device and contrivance called book-making on the race in the first count mentioned, and to gamble and bet upon a game, towit, the said race, to the great damage and common nuisance of all the citizens, &c.

The act of Congress under which this indictment is framed is the act of January 31st, 1883, and is entitled "An act more effectually to suppress gaming in the District of Columbia." By its first section it is provided " that every person who shall, in the District of Columbia, *set up or keep any gaming table*, or any house, vessel or *place*, on land or water, for the *purpose of gaming*, or gambling device, commonly called A. B. C., faro bank, E. O., roulette, equality, keno, thimbles, or ' little joker,' *or any kind of gambling table* or *gambling device*, adapted, devised and designed for the purpose of playing *any game of chance* for money or property, or who shall induce, entice or *permit any person to bet or play* at or upon any such gaming table, or *gambling device*, or on the side or against the keeper thereof, shall, on conviction, be adjudged," &c.

The second section is directed against any person who shall permit any gaming table, bank or device to be set up or used for purposes of gaming ; and the third section is directed against persons practicing certain swindling games therein mentioned. And by the fourth section it is declared " that all games, devices or contrivances at which money

or any other thing shall be bet or wagered, shall be deemed
a gaming table within the meaning of this act."

The demurrer was entered to the indictment generally,
and it is to be taken as a concession of the truth of all the
facts properly alleged.    And if either of the counts be suf-
ficient, the court below was not in error in overruling the
demurrer, as the indictment may be good in part, though
defective or insufficient in other parts of it.    1 Chitt. Cr.
Law, 443 ; *Wheeler* v. *State*, 42 Md. 563, 566.

The defendant insists that the court below erred :

*First*, in holding that there was any law in force in the
District of Columbia upon which the indictment could be
founded.

*Second*, in holding that either of the counts of the indict-
ment charged an indictable offense ; and,

*Third*, in holding that book-making, as charged in the
indictment, is unlawful in the District of Columbia.

1. With respect to the first count of the indictment,
charging, as we have seen, the offense of setting up and
keeping a gaming table, two questions are presented: First,
what constitutes a gaming table within the meaning of the
act of Congress of 1883 ; and, second, whether book-
making on a horse race is a game of chance, within the
meaning of the statute ?

In regard to the first of these questions, it is unnecessary
to go to other authority for definition than to the statute
itself.    Any games, devices, or contrivances *set up or kept
for the purpose of gaming*, or any gambling device, *so set up
and kept*, adapted, devised and designed for the purpose of
playing any game of chance for money or property, and to
which the public may resort to bet or wager money, is a
gaming table within the meaning of the statute.    The defi-
nition of a gaming table under the statute does not involve
the ordinary mechanical definition of a table, but depends
for its statutory meaning upon the means or contrivances
adopted for playing the game.    If any doubt could arise
upon the construction of the terms of the first section of the

act of 1883, that doubt would seem to be entirely and com-
pletely removed by the very explicit terms of the fourth
section of the act, which was inserted *ex industria* for the
manifest purpose of repelling ingenious attempts to evade
the real scope and policy of the act, by subtle and refined
distinctions and definitions.    The fourth section declares
" that all games, devices, or contrivances at which money
or any other thing shall be bet or wagered, *shall be deemed
a gaming table within the meaning of this act*; and the courts
shall construe the preceding sections liberally, so as to pre-
vent the mischief intended to be guarded against."    This
section must, of course, be construed in connection with
the first section of the act, and being so construed, any de-
vice, scheme or contrivance, set up or kept for the purpose
of gaming, at which any person may bet or play for money,
is a gaming table, and the party so setting up or keeping
the same is liable under the statute.    It is wholly imma-
terial to the offense under this statute of 1883, whether the
party setting up or keeping the gaming table, or house or
other place for gaming, plays or bets. at the games or not ;
it is for keeping the table, or place for gambling, that he
incurs the penalty of the statute, and not for the act of bet-
ting at such table or place.    Seeing, then, what constitutes
a gaming table within the meaning of the statute, the next
question is, whether book-making on a horse race is a game
of chance, or gambling device or contrivance, within the
purview of the statute.

This statute of 1883, was not aimed exclusively at any par-
ticular game or species of device for gaming, but was intended,
as its title and its broad comprehensive provisions declare,
more effectually to suppress gaming in this District.    The
reason and policy of the law, as well as its comprehensive
language, apply as well to all games and devices then ex-
isting, as to all that might be subsequently devised and
practiced.    That being the object to be accomplished, what
could be more grossly obnoxious to the provisions of the
statute, or more demoralizing to the community, than the

·existence of ·places for the making and selling of ·books and pools upon horse races, base ball games, foot races, dog .fights, cock fights, and all other conceivable contests upon which money may be bet or wagered.   The great evil and vice of the thing is not in the horse race, the foot race, or the base ball game, but in the seductive allurements held ·out to people, young and old, to frequent the gaming table, ·or the gambling device, and to indulge in excessive betting, .and thereby become the victims of the wily and scheming professional gambler.   Whether the game or contest upon which the wager is made be a horse race, foot race, base ball game, or what else, it is quite immaterial, if the thing ·or contest upon which the bet or wager is made be a game of chance.

    It has from an early time been held that a horse race is .a game of chance, and so is a game of base ball, and so a foot .race, where wagers have been made upon them.   *Goodburn* ·v. *Marley,* Str.  1159;  *Blaxton* v. *Pye,*  2 Wils.  309;  *Grace* v. *McElroy,*  1 Allen,  563 ;  *Lynall* v. *Longbottom,*  2 Wils. 36;  *People* v. *Weithoff,* 51  Mich. 203.   And a horse race ·being a game, within the meaning of the St. Anne, C. 14, .against gaming, though not specially mentioned, but being embraced in the general words, other *game or games* (2 Wils. 309), there can be no reason for excluding horse races .from the games contemplated or fairly embraced by the .terms of the act of 1883.   The pooling or book-making schemes are only particular methods of making the bets or ·wagers on the result of the race.   They all contemplate .putting money at stake upon the issue of the race or game. In the case of *Scollans* v. *Flynn,* 120 Mass. 271, the Court, .in speaking of pool-selling, said : " The selling of pools is ‐ .admitted to be an illegal and gaming transaction ;" and it has been held in several cases, and by eminent judges, that ·the pooling scheme is to be considered a game, and hence it is within the very letter of the statute.   It was so held by the Court of Queen's Bench, in  *Tollett* v. *Thomas,* L. R. 6 ·Q. B. 515, and also in the case of *Edwards* v. *State,* 8 La.

411. And the whole subject has been most carefully considered by Mr. Justice Cooley, concurred in by his able associates, in the case of *People* v. *Weithoff*, 51 Mich. 203. In that case the question turned upon the meaning of the word " gaming room " as used in the statute ; and it was held upon review of all the previous cases upon the subject, that pools on horse races or base ball games, are " games " within the statute against gaming.

In view, therefore, of the authorities to which we have referred, and especially of the strong and comprehensive language employed in the statute, we are of opinion that there is no sufficient ground for demurrer to the first count in the indictment.

2. Then, with respect to the second count, that would seem to be less subject to criticism than the first. This second count charges that the defendant did *set up and keep a place* for the purpose of gaming, to-wit, a booth, for gaming for lucre and gain, and did cause and procure divers idle and evil disposed persons to come together to gamble and bet at and upon the game, device, and contrivance in the first count mentioned, called book-making, on the race, &c., to the common nuisance, &c.

The statute of 1883 is explicit in declaring that the keeping of such a place shall be a misdemeanor. And if the making of books on horse races be games of chance, as we have shown them to be, there can be no doubt but that this count charges an offense within the statute.

The general scope and object of the act of 1883 are very similar, though expressed in different and more comprehensive terms, to that of the St. 16 and 17 Vict., C. 119. The English statute is entitled "An act for the suppression of betting-houses," and it recites in its preamble that "a kind of gaming has of late sprung up, tending to the injury and demoralization of improvident persons, by the opening of places called betting houses or offices, and the receiving of money in advance by the owners or occupiers of such houses or offices, or by other persons acting on their

behalf, on their promises to pay money on events of horse races *and the like contingencies*," and it enacts, that no house, office, room or *other place* shall be opened, kept or used for the purposes mentioned in the preamble, &c.  And by section 3 it is provided that any person who, being owner or occupier of any house, office, room or *other place*, shall open, keep, or use the same for the purposes aforesaid, shall, &c. In the case of *Bows* v. *Fenwick*, L. R. 9 Com. Pl. 339, the defendant was on a race course standing on a stool, over which was a large umbrella, similar to a carriage umbrella, capable of covering several persons, the stock being made in joints like that of a sweep's brush, so as to be taken in pieces, and was fastened in the ground with a spike.  The umbrella, when open, was seven or eight feet high.  It was a showery day, but the umbrella was kept up rain or no rain.  There was also a card exhibited, on which were the words, " We pay all bets first past the post."  The defendant was calling out, offering to make bets ; and he was seen to make several bets, the money being deposited with him, and for which he gave a ticket.  On this state of facts, it was held, that the defendant was using a fixed and ascertained place for the purpose of gaming or betting with persons resorting thereto, and that he was properly convicted under the St. 16 and 17 Vict.

That case is important as an authority to show what will constitute "a place" within the meaning of the statute ; and it is also important in two other respects : First, as showing the fertile ingenuity of the class of people intended to be restrained by these statutes, in devising ways and means to avoid or evade them, and, second, as showing that the courts will not allow such devices and contrivances to defeat the plain objects and policy of the law.

In another case arising under the same statute, 16 and 17 Vict. C. 119, that of *Eastwood* v. *Miller*, L. R. 9 Q. B. 440, it appeared the defendant was occupier of certain enclosed grounds, in which a pigeon shooting match took place between two persons for a wager, and afterwards a foot

race took place, and into which enclosed grounds the public were admitted on payment of money. These persons, thus admitted, made bets with each other, both on the pigeon shooting match and on the foot race. In that case there was book-making on the games. The evidence showed that among those present were two book-makers with books in their hands; and that those two men were shouting, " Twenty to two on the match." This was on the pigeon match. The book-maker took a ticket out of his pocket and gave it to one of the men and said, " That's on Wooler." Soon after this, Wooler was going to shoot at a pigeon, when a man shouted out, " Four to one he kills." This bet was taken, and the man said, " Three to one he kills." Persons were shouting all over the grounds, but it appeared the defendant was taking no part in the betting that was going on. He was, however, convicted as the keeper of a place for gaming in violation of the statute. It was held, that to constitute "a place," within the meaning of the statute, it is not required that there should be an erection of any kind, but that there must be a designated place kept for betting. We have recited the facts of that case as furnishing an insight into the methods and modes of proceeding at such places kept for gaming; though there are many games upon which books are made and pools are sold, to take place in the future, and at a distance from the place of actual betting.

In the case now before us, the appellant contends: First, that the act of 1883 never applied to or contemplated book-making, as that term is known and understood among the gaming class or fraternity; but, second, if that act be construed to embrace such game, device or contrivance for betting, as originally enacted, it has been modified and restricted by subsequent acts of Congress, so as to withdraw such game, device or contrivance from the operation of that act—the latter acts operating, by implication, as a repeal of the first act, *pro tanto.*

The first of these contentions we have already disposed

of, in what we have said in regard to the construction of the act of 1883. And in regard to the second ground of contention, we are of opinion that it has no foundation for its support whatever.

The subsequent acts relied upon, as having such modifying and restrictive effect upon the prior act of 1883, are the acts of 1888 and 1891. The act of 26th of April, 1888, is entitled "An act to prevent any person or persons in the cities of Washington and Georgetown from making books and pools on the result of trotting or running races or boat races." The act of March 2, 1891, is entitled "An act to prevent book-making and pool-selling in the District of Columbia." Both of these acts are prohibitory in their terms and provisions, and neither of them makes any reference whatever to the prior act of 1883.

By the first of these subsequent acts, that of 1888, it is provided that it shall be unlawful for any person or persons, &c., in the cities of Washington and Georgetown, in the District of Columbia, *to bet, gamble, or make books and pools on the result of any trotting race or running race of horses*, or boat race, or race of any kind, or any election, or contest of any kind, or game of base ball." The succeeding act of March 2, 1891, simply re-enacts the provisions of the preceding act of 1888, but ·extends the operation of such provisions to territory one mile beyond the limits of the said cities, and makes a slight alteration in the minimum punishment that may be inflicted.

It requires but a casual reading of these several acts of Congress to perceive that the latter acts had for their object the prohibition and punishment of an offence quite different from that contemplated by the act of 1883. The act of 1883 has for its object, as we have before stated, the suppression of gaming tables and places set up and kept for gambling, and to which all persons are invited to resort for the purpose of gaming, but under which act none but the party who keeps the table or place is liable to prosecution. But not so under the later acts. Their object was to declare

unlawful, within certain prescribed limits, the simple acts of betting, gambling or making books or pools on certain games or contests, without reference to the fact whether such betting or book-making and pool-selling be at a gaming table or at a place kept for gambling. It is true, the betting, gambling or making of books and pools forbidden by these latter acts, if made or done at a gaming table or gambling device, or at a house or place set up and kept for gaming, if within the prescribed limits, would offend against the provisions of these latter acts, or the last of them. But it is no less true, that such gaming would be in violation of the provisions of the act of 1883, as against the party setting up or keeping such gaming table or place. The party setting up or keeping such table or place may be guilty, though he did not particpate in making the bets or pools. The offence created and intended to be punished by the act of 1883, is not only different, but is much graver in its character than the offence provided against in the subsequent acts; and the punishment is much more severe. There is, therefore, no conflict whatever between the act of 1883, under which the indictment was found, and the subsequent acts of 1888 and 1891. The former act applies to the whole District, and the subsequent acts, creating a different offence, were intended to apply only within prescribed limits.

The pleader, in both counts of the indictment, has averred the place at which the offence was committed to be distant more than one mile from the boundaries of the cities of Washington and Georgetown, thus having reference to the limits prescribed in the act of March 2, 1891. This averment, however, was quite unnecessary; but it does not vitiate the indictment. The matter thus unnecessarily averred may be treated as surplusage. *State* v. *Webster*, 39 N. H. 96; *State* v. *Nations*, 75 Mo. 53; *State* v. *Munch*, 22 Minn. 67; *State* v. *Smouse*, 50 Iowa, 43.

Finding no error on the judgment on the demurrer in the court below, that judgment will be affirmed; and it is so ordered.

*Judgment affirmed.*