374

## BOOSALIS v. CRAWFORD.
### No. 6966.

United States Court of Appeals for the
District of Columbia.
Decided July 18, 1938.

Harry T. Whelan, W. B. O'Connell and Wm. A. Gallagher, all of Washington, D. C., for appellant.

David A. Pine, U. S. Atty., John J. Wilson, Asst. U. S. Atty., Elwood H. Seal, Corp. Counsel, and Chester H. Gray, Asst. Corp. Counsel, for appellee.

Before GRONER, Chief Justice, and STEPHENS and EDGERTON, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a judgment of the District Court of the United States for the District of Columbia. The action was one in replevin brought by the appellant as owner of three "claw machines" seized by members of the Metropolitan Police Department, District of Columbia, and delivered to the appellee as Property Clerk of the Department. There was a trial to a jury. At the outset of the trial it was stipulated that the machines were the property of the appellant and that they were seized by the police; it was stipulated further that the case was to be a test case to determine the legality of the operation of claw machines in the District. As the case was tried below the only substantive issue raised was whether the machines were, within the meaning of the pertinent statutory provisions, gambling devices. As to the power of the police to seize and forfeit the machines if they are gambling devices, no question was raised below and none is raised on this appeal. Evidence was introduced by both parties. To the admission of certain of the evidence objection was made and exception taken. At the close of the case the appellee moved for a directed verdict and the motion was granted. Thereafter a motion for a new trial was made and denied, judgment for the appellee was entered, and this appeal was taken.

The basic question before us is whether the trial judge was justified in taking the case from the jury. A court may direct a verdict against a plaintiff if the evidence is such, giving the plaintiff the full effect of every legitimate inference, that no reasonable juryman could reach a verdict for him. Lyons v. Liberty Nat. Bank, 67 App. D.C. 14, 89 F.2d 486, 1937; Fleming v. Fisk, 66 App.D.C. 350, 87 F.2d 747, 1936; Speirs v. District of Columbia, 66 App.D. C. 194, 85 F.2d 693, 1936.

The pertinent statutory provisions are:

"Whoever shall in the District set up or keep any gaming table, or any house, vessel, or place, on land or water, for the purpose of gaming, or gambling device commonly called A B C, faro bank, E O, roulette, equality, keno, thimbles, or little joker, or any kind of gaming table or gambling device adapted, devised, and designed for the purpose of playing any game of chance for money or property, or shall induce, entice, and permit any person to bet or play at or upon any such gaming table or gambling device, or on the side of or against the keeper thereof, shall be punished by imprisonment for a term of not more than five years." [D.C.Code (1929) tit. 6, § 153]

"All games, devices, or contrivances at which money or any other thing shall be bet or wagered shall be deemed a gaming table within the meaning of sections 153, 154, and 155 of this title; and the courts shall construe said sections liberally, so as to prevent the mischief intended to be guarded against." [D.C.Code (1929) tit. 6, § 156]

This court, in accordance with the Congressional injunction in the second paragraph, has construed the first one liberally. See Miller v. United States, 6 App.D.C. 6, 1895, and Swan v. United States, 54 App. D.C. .100, 295 F. 921, 1923, holding that accepting bets upon horse races is within the statute. We said:

" 'Any games, devices, or contrivances *set up or kept for the purpose of gaming,* or any gambling device, *so set up and kept,* adapted, devised and designed for the purpose of playing any game of chance for money or property, and to which the public may resort to bet or wager money, is a gaming table within the meaning of the statute. The definition of a gaming table under the statute does not involve the ordinary mechanical definition of a table, but depends for its statutory meaning upon the means or contrivances adopted for playing

the game.' " [54 App.D.C. at page 102, 295 F. at page 923; 6 App.D.C. at page 12]

The claw machines involved in the instant case and illustrated in the accompanying cut taken from the record, consist, as

shown by the **evidence**, of **a** miniature electric shovel or claw operating through a boom and mast set upon the forward portion of a miniature ship within a glass case.

When in operation that portion of the case surrounding the ship is filled with candy to approximately the level of the top of the hull. Set upon the candy are items of merchandise such as kodaks, wrist watches, safety razors, clocks. Operation of such a machine, when carried on by a player according to the printed directions, is as follows: The player turns the locator-handle at the right center of the machine to the right or left with the effect of moving the boom and the claw so that the latter will be suspended at a point in the vicinity of a desired article. He then inserts a nickel in the aperture at the left center of the machine. This causes an electric motor to commence operating and the following movements occur: first, the boom moves forward; second, the claw drops down, spreading as it touches an object; third, the claw returns upward, closing as it does so; fourth, the boom moves backward, carrying the claw to a position over a chute located in the prow of the ship; fifth, the claw drops and opens. If the claw descends upon an article it may grasp the same in its closing and upward movement and carry and deposit it in the chute. When this occurs, the player, by pulling out the receptacle in the center of the machine, obtains the article.

█ It would serve no useful purpose to detail the evidence introduced in respect of the question whether or not the machines operate as gambling devices. Suffice it to say that in respect of a player operating a machine according to directions, the evidence was uncontroverted that, except to the extent that he could, by turning the locator-handle, suspend the claw in the vicinity of a desired article, the operation of the machine was beyond his control. It was further uncontroverted that even if the claw were suspended immediately over an article, "there are chances that the claw may not strike the article . . ., that if it does strike the article, it may not grip the article, or, having gripped the article, that it may slip off, without in any way moving the article, or that, if it does lift the article, the article may drop off before reaching the chute, or may be knocked off by some other articles in the way." So it was put by the trial judge, and we think accurately. Under these circumstances, no reasonable juryman could reach a conclusion that these machines were not gambling devices within the meaning of the statute. Even giving the appellant the benefit of an assumption that the evidence establishes that skill played a part in suspending the claw in the vicinity of a desired article, no other conclusion could reasonably be reached than that, on the whole of the operation of the machines according to directions, chance predominated over skill or was present in such manner as to thwart the exercise of skill. Under such facts, the device operates as a game of chance. See Commonwealth v. Plissner, Mass., 4 N.E.2d 241, 1936; Commonwealth v. Ward, 281 Mass. 119, 183 N.E. 271, 1932; People ex rel. Ellison v. Lavin, 179 N.Y. 164, 71 N.E. 753, 66 L.R.A. 601, 1 Ann.Cas. 165, 1904. These cases construed the phrase "game of chance"; and Commonwealth v. Plissner and Commonwealth v. Ward involved claw machines.

There was evidence in the case which tended to establish that an experienced player, going beyond directions, could, by rapidly spinning the locator-handle after the claw had seized an article and moved it upward, cause the boom to carry the claw and article more swiftly than it otherwise would to a point over the chute; and that this decreased the chances of the article's being dropped on the way, so that such a player would have substantial success in obtaining an article once it had been grasped by the claw. But the appellant cannot escape the force of the statute because a player may, by going beyond the directions upon the machine, achieve a skill resulting in substantial success in obtaining articles once they have been grasped by the claw. It would overstrain credulity to conclude that the appellant set these machines up to be operated beyond directions and in a manner which would enable a skilled player to get a valuable item of merchandise for a nickel. Obviously the machines were adapted, devised, and designed to operate in favor of the house.

█ In respect of the admission of evidence: The testimony of certain police officers that they operated the machines according to directions and largely unsuccessfully was objected to as negative in character. This objection goes to the weight, not to the admissibility, of the evidence.

█ The testimony of certain police officers as to their observation of the use of the machines by others was objected to as res inter alios acta. This rule of exclusion is designed to apply to evidence of transac-

377

tions not affecting a party to the litigation and to which he was not a party. See Humble, Evidence (1934) § 342. But the rule is one merely of auxiliary policy authorizing a trial judge to exclude evidence which unduly multiplies issues or which, though relevant, may be unfairly prejudicial. See Hughes, Evidence (1907) pp. 36-7; 1 Wigmore, Evidence (2d ed.1923) c. 16, and especially therein Sections 443 and 444. So considered the rule is inapplicable in the instant case. The issue here is not one between the appellant and another as to the operation of the machines upon a particular occasion. The issue is whether or not the machines are gambling devices as played by the public according to directions. The manner and effect of the operation of the machines by members of the public, whether testified to by players themselves or by those observing players, is relevant to this issue; and such relevancy is not dependent upon the resolution of collateral issues. The evidence was not unfairly prejudicial. Affirmed.