**Jean TOOLEY, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 1057.**

United States District Court
D. Nevada.

June 27, 1955.

Hawkins & Cannon, Howard Cannon, Foley & Foley, Las Vegas, Nev., Chargin & Briscoe, Anthony J. Chargin, Stockton, Cal., for plaintiff.

Franklin Rittenhouse, Reno, Nev., Madison B. Graves, Las Vegas, Nev., U. S. Attys., and Stanley H. Brown, Reno, Nev., Asst. U. S. Atty., for defendant.

ROSS, District Judge.

This matter came on for a two day trial, without a jury, on the 1st day of December, 1954.

## Nature of The Case

Jean Tooley, a citizen of the United States, residing at Las Vegas, Nevada, on the 18th day of July, 1952, paid the sum of $250 to the Collector of Internal Revenue, District of Nevada, as a special tax levied under the provisions of Title 26 U.S.C. § 3267(a) (2), upon a coin operated machine or device known as the "Sidebottom Super Crane Machine." Thereafter and on August 4, 1952, plaintiff filed a claim with the Commissioner of Internal Revenue demanding refund of the sum of $240, being the difference between the sum of $250, the tax levied under the above section, and the sum of $10.00 which plaintiff alleged to be the legal tax under subsection (a) (1) of the same section.

Plaintiff contends that this particular machine, the "Sidebottom Super Crane Machine," by reason of its mechanical construction causing it to differ from other crane machines in use, it is not a gambling device within the meaning of Section 3267(a) (2), but is a coin operated amusement device entitling it to be taxed at the annual rate of $10. The plaintiff asserts that this claw machine is different from all other types, in that the boom and claw have a 360 degree playing area permitting it to swing through the entire circle of the playing area, and also that the sixteen point star mechanism controlling the location of the boom makes it possible for every point in the circular playing area to be reached by the claw suspended from the revolving boom.

The government, defendant in this case, takes the opposite view, namely, that the "Sidebottom Super Crane Machine" operated by the plaintiff is not an amusement device, but on the contrary is a gambling device upon which she was and is required to pay an annual license tax of $250. Thus the issue is joined between the parties.

## Findings of Fact

The Court finds the following facts to be true. When the machine is prepared for play it has a covering of candy of about the size and shape of kernels of corn spread on the floor of the playing surface. On this cushion the operator (as distinguished from the player) places about thirty metal figurines. When the player is successful the claw grips a figurine.

A nickel deposited in the slot provided for that purpose actuates a synchronous motor running at a constant speed. The playing phase is completed in approximately four seconds and the boom and claw comes to rest directly over a chute in the front of the machine. If one of the figurines is captured the claw releases it into the chute through which it drops down to the lower part of the machine where the player can remove it from a receptacle attached to the front of the cabinet.

There is a control lever, or indicator, by which the player through adjustment can determine into which area of the playing field the claw will drop. When the Control lever is manipulated for position this is reflected on an indicator fixed to the back of the machine. The "target" area of the claw is further determined by the manipulating of a control wheel on the front of the machine. Mr. Sidebottom, the builder of the machine briefly stated the operation of the machine as follows:

> "Well, the operation of it consists of selecting and picking out the piece you wish to play for and depositing the coin and holding on to the control wheel, which gives you a control throughout the entire operation." (T.5)

The figurines are smooth metal figures without any appreciable angles and when they are placed in certain positions on the bed of the playing field it is possible for the claw to grasp them long enough to get them into the chute, thence into the player's possession. On each "try" there are five possibilities; (1) the claw misses the target and does not grasp anything; (2) the claw strikes some other figure which it fails to grasp and by reason of this interference the target is missed; (3) the target is missed but the claw grasps some figure other than the target; (4) the claw grasps the target figure but it is dropped before it is dropped in the capture chute; (5) the target figure is captured, carried to the chute and delivered to the player. The Court finds that, regardless of the experience of the player, one cannot predict with any degree of certainty just which of these five possibilities will occur.

Regardless of all mechanical and arithmetical computation the probability of the claw grasping a figurine in the first instance depends upon the manner in which the figurine is placed on the candy bed, for it is entirely within the power of the operator to place the figurines in whatever position he chooses. The favored positions, or holds, on the figurines can be exposed so as to permit them to be grasped by the claw or placed so that it is almost, if not totally, impossible for the claw to grasp the "holds" on the figure.

In addition to Mr. Sidebottom, who perfected and built the machine in question, plaintiff put on two other witnesses. William W. Harper was a consulting physicist. Mr. Harper testified as to a series of tests he made with the machine in which he used a grid marked paper on the floor of the playing area of the machine, having cleared out the figurines and candy. By the use of the marked grid paper Mr. Harper ran what he termed "reproductibility" tests. In short, he attempted to compute how often the claws fell in each grid under similar circumstances. The second test made by this witness was to place a figurine in a given position and then see what would take place trying to grip the figure under different circumstances. While these observations were interesting the Court does not give them much weight for the obvious reason that in His experiments Mr. Harper immediately eliminated the greatest degree of gamble, or chance, by using a fixed grid instead of the elusive figurines, which could be placed in the candy floor by the operator in such a manner as to either expose or conceal the holds available to the claws, and second, and by the removal of all of the figurines except the one with which he experimented, he entirely eliminated the element of interference. When the machine is in actual play with some thirty figures on the candy floor there is a constant interference by the other figures with the player's attempts to capture a given target, both in attempting to make the initial capture, and thereafter in getting the captured figure safely to the chute.

Mr. Harper stated "as far as playing the game a large number of times, personally I didn't do that, but it was played under my supervision in order to determine the skill that could be developed in removing the figurines from the candy." It appears that the two assistants used by him were his sons, age fourteen and seventeen.

The third witness on behalf of the plaintiff was one Dr. Paul L. Kirk, a professor of criminology at the University of California and an outside consultant. Dr. Kirk based his conclusions, to a large extent on experiments made with small rubber balls in lieu of the figurines. Quoting Dr. Kirk:

"The experiments were set up to test the element of chance first and in order to simplify that test, the first actual tests were not run with figurines because figurines had grips, that is certain places where the claws will catch and certain places where the claws will slip out

and not being familiar with those figurines, my judgment could not be very vital and I would not be testing the machine so much as I would be testing my judgment, so I picked instead of a figurine, something which had a grip on all sides, namely, rubber balls. They were small enough to be grasped invariably when contact was made, and were grasped, regardless of your position, because it doesn't make much difference which direction, the same kind of contact is made, and in order to establish that I was dealing chance alone, I just threw rubber balls in, scattered on one side."

Again, we say that the tests, though interesting, did not demonstrate a great deal about the reaction of the machine when used with figurines under conditions faced by the average player. The rubber balls were small enough to fit easily into the claw and were captured regardless of their position, the outward surface exposure being always the same, whereas the figurines, many times larger and with slippery and irregular surfaces, could only be grasped by contact with the so-called "holds" which could only be reached by the claws in the event the figure was placed in a receptive position.

To add further zest to the playing of the machine, red, green and white strips of paper were attached to the figures, red being worth $5.00, green $3.00, and white $1.00. If the player captured a figurine he would be paid by the operator in accordance with the color strip the figure had attached to it. (T.41) As Mr. Sidebottom stated, referring to the colored strips governing pay-off (T.41):

"Yes sir. The red strip means $5 and is put on the piece to identify it as a $5 piece and is only on those pieces more difficult to get out, for two reasons—that the piece itself is more difficult to grasp, probably has fewer holds. The second reason, the way it is "dressed" (meaning the manner in which the operator places the figures on the candy floor)

to the machine determines the ease with which the player can take out the piece."

The number of the colored strips attached to the figurines is dependent upon the whim of the operator, both as to the total number of all colors combined, and the ratio of each color used to the other colors used. (T.44)

The government put on only one witness, James W. Chalk, an Internal Revenue Agent in the Nevada District. At the request of the United States Attorney he conducted certain playing tests on the machine present in Court. It is to be noted that the machine in Court was not the machine on which plaintiff paid the $250 license tax, but one similar to it. The machine was played about four thousand times in Las Vegas and one thousand times during the trial after Court had recessed. The witness, who would be roughly equivalent to the average player stated (referring to the four thousand plays made at Las Vegas):

"In the first thousand plays I received 13 prizes; in the second thousand plays I received 17 prizes. Then the machine was redressed (more figures placed in it.) In the first thousand I received 21 prizes; in the second thousand I received 11 prizes."

### Plaintiff's Contentions

Plaintiff in her opening brief makes the following arguments:

I. The "Sidebottom Super Crane Machine" is not a slot machine within the meaning of Title 26 of the United States Code, Section 3267. (1) The statutory test is whether skill predominates over chance.

II. Assuming, arguendo, that the test is merely whether a substantial element of chance is involved rather than dominance of chance over skill the "Sidebottom Super Crane Machine" is still a device of skill.

Then in her reply brief the plaintiff asserts the following propositions:

I. The "Sidebottom Super Crane Machine" is predominately and substantially a game of skill and the chance element, if any should exist, is negligible.

II. Player control of the "Sidebottom Super Crane Machine" continues throughout the cycle of operation; and pin-ball machines in which the player has no control over either the selection of the targets or the value of the prize for successful play, and only limited control of its operation, are not comparable.

### Defendant's Contentions

I. The "Sidebottom Super Crane Machine" is a gaming device subject to the excise tax imposed by Section 3267(a) (2) of the Internal Revenue Code of 1939.

(a) The term "by the application of the element of chance" in Section 3267(b) (2) of the Code requires a substantial element of Chance and does not require that chance predominate over skill.

(b) Like a "pin ball" machine the player of the Sidebottom machine lacks "control" during its entire cycle or operation.

The Statute Involved. Section 3267.

Section 3267, Title 26, 1954 Supp.:

"(a) *Rate*. Every person who maintains for use or permits the use of, on any place or premises occupied by him, a coin-operated amusement or gaming device shall pay a special tax as follows:

"(1) $10 per year in the case of a device defined in clause (1) of subsection (b);

"(2) $250 per year, in the case of a device defined in clause (2) of subsection (b); and

"(3) $10 or $250, as the case may be, for each additional device so maintained or the use of which is so permitted. If one such device is replaced by another, such other device shall not be considered an additional device.

"(b) *Definition*. As used in this Part, the term 'coin-operated amusement and gaming devices' means (1) any amusement or music machine operated by means of the insertion of a coin, token, or similar object, and (2) so-called 'slot' machines which operate by means of insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine to receive cash, premium, merchandise or tokens. The term does not include bona fide vending machines in which are not incorporated gaming or amusement features. For the purposes of this section, a vending machine operated by means of the insertion of a 1 cent coin, which, when it dispenses a prize, never dispenses a prize of a retail value of, or entitles a person to receive a prize of a retail value of, more than 5 cents, and if the only prize dispensed is merchandise and not cash or tokens shall be classified under clause (1) and not under clause (2).

"(c) *Applicability of administrative provisions*. An operator of a place or premises who maintains for use or permits the use of any coin-operated device shall be considered, for the purpose of subchapter B, to be engaged in a trade or business in respect of each such device."

### Comments

The machine in question was intended to be played by the average player and should be evaluated from that standpoint and not from the approach of the so-called expert. No one will question the

fact that craps, twenty-one and roulette are games of chance with percentages heavily loaded in favor of the house, yet there are some expert players, cross-roaders, who can outplay and break the house even on these admitted gambling games. But that does not convert these games from games of chance to games of skill. Neither, do we think does the fact that Mr. Sidebottom, who devised and built the machine, had appreciably better playing results than the average player convert the machine into an instrument of skill. Certainly it does not so far as average players are concerned. He plays a few times and moves on. He has neither the time nor the inclination to spend a couple of years studying the idiosyncrasies of the machine.

The fact that the figurines had attached to them red, green and white strips entitling them to be redeemed for five, three and one dollars would appear to take the game out of the amusement category and place it in the play for profit class.

The Court feels that it would add nothing to this opinion to tabulate all of the various results obtained by the so-called expert witnesses. As pointed out the experiments were mostly made under conditions "fixed" by the person conducting the tests. It is one thing to say that the two and a quarter inch spread claws will snare a two inch rubber ball, or fall in a marked location on a grid, and quite a different thing to calculate the progression of skill with figurines, which have at the best only certain precarious holds that can be grasped, and even this sporting chance made more difficult or entirely eliminated by the operator's skill and experience in placing the figures in the candy with most, or all, holds covered. The operator has complete control over the placement of the figures and in our opinion this alone would nullify, if not eliminate, the element of skill. Certainly, if the mechanical operation of the machine was always identical, and if the figures were similar in size and shape,

and if they contained the same holds, and the holds were in each instance in the same places, and the cord or cable suspending the claws from the boom were always the same length, then it would appear that the average player might within a reasonable period of time, by assiduous application to the problem, become more proficient as time went on. But such is not the case here. A variation in any one of these conditions would, and does, create a new hazard with which the player must cope. The chance element preponderates over the element of skill.

### Conclusions of Law

From the foregoing findings of fact the Court concludes as a matter of law that the "Sidebottom Super Crane Machine" of the type present in Court and upon which the plaintiff seeks to recover from the Internal Revenue Commissioner the sum of $240 upon the theory that she paid $250 license tax on a gambling device whereas she should have only paid $10.00 on an amusement device, is not a game of skill; that such machine is a gambling device; that it is a game of chance. The Court further concludes as a matter of law that the "Sidebottom Super Crane Machine" is a gaming device within the meaning of, and subject to, the excise tax imposed by Section 3267(a) (2) of the Internal Revenue Code of 1939. The Court further concludes that the expression "by application of the element of chance" as used in said Section 3267(b) (2) merely requires that there be a substantial element of chance involved in the play of the machine, and does not require that the element of chance predominate over the element of skill. The Court has found, however, as a finding of fact, that a substantial element of chance is involved in the playing of the machine in question, the Sidebottom Super Crane Machine, and that such element of chance preponderates over the element of skill in the playing of the machine. Boosalis v. Crawford, 69 App.D.C. 141, 99 F.2d

374; United States v. 24 Digger Merchandising Machines, 8 Cir., 202 F.2d 647; Johnson v. Phinney, 5 Cir., 218 F.2d 303; State v. Wiley, 232 Iowa 443, 450–451, 3 N.W.2d 620; Williams Mfg. Co. v. Prock, 5 Cir., 184 F.2d 307; Chambers v. Batchel, 5 Cir., 55 F.2d 851, 852–3; Hunter v. Mayor and Council of Teaneck Tp., 128 N.J.L. 164, 24 A.2d 553; State v. Betti, 21 N.J.Misc. 345, 34 A.2d 91.

The defendant will submit a proposed judgment in accordance with the foregoing opinion, findings of fact, and conclusions of law.