**BEARD et al. v. UNITED STATES.**

No. 6480.

United States Court of Appeals for the District of Columbia.

Argued Dec. 9, 1935.

Decided Feb. 3, 1936.

838

John J. Sirica, Martin F. O'Donoghue, and Maurice McInerney, all of Washington, D. C., for appellants.

Leslie C. Garnett, U. S. Atty., and Roger Robb and John W. Fihelly, Asst. U. S. Attys., all of Washington, D. C.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

All thirteen appellants were indicted for setting up and keeping a gaming table for the purpose of gaming; and for setting up and keeping a certain place for gaming; and for conspiracy to violate certain sections of the District of Columbia Code (the substantive offenses). All were charged with committing one or more specified overt acts. A joint demurrer and a joint motion to quash were overruled. A bill of particulars was filed, limiting each count of the indictment in point of time to the period January 1 to December 14, 1934, and designating the place as 508 Mather building in Washington, District of Columbia. The bill of particulars further declared that it was purposed to show that the conspiracy contemplated the setting up of gaming tables, etc., at a number of different places in the city of Washington.

At the trial none of appellants testified, and all the evidence offered in their behalf was character evidence as to one of them. The government proved that the rooms in question in the Mather building had been occupied for a number of years by organizations purporting to be engaged in disseminating racing information. The names that from time to time appeared on the door of the suite were Wilson Company, Empire Company, Shepherd Company, Southern News Co., etc. In September, 1934, the name on the door was changed to National Amusement Company. Hutchins, one of appellants, had paid the rent for the suite for "the last eight or ten or twelve months." He and appellants Beard, O'Callaghan, Smith, Levy, Gallagher, and Meese were frequently seen in and about the building on the floor on which the alleged gambling establishment was maintained.

Preceding June, 1934, the occupant of the suite had subscribed to eleven central office telephone lines and twenty-four private telephone lines; i. e., lines connecting —without central office assistance—the suite with sundry places in Washington city. On June 30, 1934, these telephones were disconnected, and on September 15th Harwood, who was indicted but never arrested, arranged with the telephone company to install sixty central office telephones in the suite. He gave the telephone company a check for $2,210 as a deposit. The check was drawn on a bank account established for that specific purpose.

In September, 1934, Police Officer Little, another officer, and an assistant district attorney went to the suite and endeavored, but unsuccessfully, to gain admission. Then they went to a room adjoining, where, by listening, they heard voices broadcasting horse race news and taking horse race bets. On October 2, 1934, the police tapped the telephone wires connecting the telephones in the suite. They listened in on October 2, October 3, October 4, and October 5. They heard some person or persons in the suite giving out information concerning horse races and receiving bets on horse races. With each incoming call they heard the person calling identify himself by a number. Seven of the numbers were 4, 7, 10, 18, 22, 27 and 28; and the seven persons calling in placed bets with some person in the suite.

In the afternoon of October 5th the police obtained a warrant from the United States commissioner for the arrest of George Harwood, alias Willie Carroll, and went to the door of the suite and demanded admittance. As no response was made, they broke down the door. On entering they found a large room equipped with a switchboard running on three sides of the room. On the switchboard were approximately twenty-five telephones, most of them ringing,—which were in turn connected to 69 call boxes and about 630 small copper switches. The switches were marked with tabs bearing numbers. In front of each telephone was a "run-down sheet" showing the entries at the various race tracks. At one end of the room was a pigeonhole file cabinet, in which were found several hundred slips recording bets on horse races. In another room were found slips recording bets on races run that day. In the lower right-hand corner of these slips appeared numbers corresponding to those the police had heard over the telephones. The slips were in nine different handwritings. As a matter of fact, slips were found recording each bet which the officers had heard telephoned in during the hours preceding the raid, and these corresponded identically with the stenographic transcript of the telephone conversations recorded by a stenographer who listened in with the police. There was also found other betting paraphernalia and twenty-five loaded dice.

On one of the switchboards there was found a sheet of paper (known to the record as Exhibit 48) containing seventeen telephone numbers and, to the left of each number, a separate and different number. The last-named numbers corresponded with the numbers which the police had heard called in over the telephones from the outside before bets were made; and the telephone numbers, as shown by the telephone company's records, designated telephones located in places which, as we have seen, were charged by the district attorney as other places in which gambling was carried on in connection with the place raided. For instance, on Exhibit 48, opposite "Number 16" was "Dist. 1808"; and the latter, by reference to the telephone company's records, was shown to be a telephone located at 514 Tenth Street N. W. No. 16, in turn, was (on the theory of the prosecution) the code or identification number of the place from which the calls originated.

Evidence was introduced showing, as to some six or eight of such places, that

they had been raided from time to time during the time period covered by the indictment and were known to the police as gambling places. There was also evidence that the blank betting slips which were found by the police were delivered to appellant Heck in May, 1934, on his order, pursuant to an original order placed by appellant Beard in 1932.

At the conclusion of the government's case, appellants each moved for a directed verdict as to each count of the indictment, which was denied. On the trial the jury found all guilty on all counts. There was judgment on the verdict.

There are eighty-two separate assignments of error, but a number are abandoned, and we shall discuss only those which were pressed in argument or the brief.

First. Was the indictment defective? It is challenged on the ground that it is vague. It is said that neither of the first two counts gives the location in the District of the gaming table or the place; that there is no reference to the date or dates on which the bets were taken; and that there is no particular allegation that money passed. The criticism of the conspiracy count is that it is not charged there is any relationship between the conspiracy and the overt acts alleged to have been committed in furtherance of its objects, and it is said that it was not proper to combine in one indictment the substantive counts and the conspiracy count.

We think none of these objections well taken.

■ R.S. § 1025 (18 U.S.C.A. § 556) was enacted for the purpose of preventing miscarriage of justice through the application of technical rules in relation to matters of form in indictments, and it is now universally held that the sufficiency of a criminal pleading is to be determined by practical, rather than technical, considerations. Or, as the Supreme Court said, the rigor of the old common-law rules has yielded in modern practice to the general principle that formal defects not prejudicial will be disregarded. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861. It is ordinarily enough, if the indictment contains the essential elements and ingredients of the offense charged; and this for the purpose of apprising the accused of the nature of the charge and protecting him from a second prosecution.

■ Here the indictment charged the offense as occurring in the District of Columbia. That was sufficient as to location. Pope v. United States (C.C.A.) 289 F. 312. It charges the maintaining of a gaming table and a place in which gaming was done. The statute in neither case requires proof of the passing of the money.—The indictment is drawn in almost the language of the statute, and charges that both as to place and table defendants were conducting a gaming establishment. That is sufficient. Miller v. United States, 6 App.D. C. 6; Swan v. United States, 54 App.D.C. 100, 295 F. 921. And in an indictment for conspiracy it is sufficient to allege that the overt acts were done to effect the object of the conspiracy. Felder v. United States (C.C.A.) 9 F.(2d) 872. Nor is there anything in the point that the government has chosen to join a conspiracy count with the other counts. All the counts relate to the same acts and transactions, and all depend on substantially the same proof. Chew v. United States (C.C.A.) 9 F.(2d) 348, 353. In such case section 1024, R.S. (18 U.S.C. A. § 557) provides for joining all in one indictment. It was a common practice in indictments under the National Prohibition Act (27 U.S.C.A.) to join charges of possessing whisky, selling whisky, and of conspiracy to manufacture whisky in the same indictment. See Goodfriend v. United States (C.C.A.) 294 F. 148. See, also, Perry v. United States (C.C.A.) 18 F.(2d) 477; Hood v. United States (C.C.A.) 23 F.(2d) 472.

■ The test is whether the same evidence is necessary to establish both charges, for in those circumstances counts relating to the same transactions or series of transactions may be joined, even though the offenses are not of the same grade. Kelleher v. United States, 59 App.D.C. 107, 35 F.(2d) 877.

We think the indictment sufficient.

■ Second. We have already said that before battering down the doors the police had obtained a warrant of arrest for one George Harwood, alias Willie Carroll. Harwood was the man who had arranged with the telephone company for the installation of the sixty telephones and had made the $2,210 deposit for this service. When the police entered and made the arrests, they were unable to identify Harwood, and, as it now appears, he was not present. The name, Willie Carroll, which the police thought was an alias of Har-

wood, was called and, no one present answering to that name, the warrant remained unserved, though it afterwards developed that Carroll was in fact present but that he and Harwood were different persons. No arrest, therefore, was made under the previously issued warrant, and all of appellants subsequently moved to quash it on various grounds; but we do not stop to notice these, for the reason that in our opinion the grounds on which the warrant was issued were sufficient for its issuance. But, even if there be doubt of this, which we think is not the case, we are still of opinion that search and seizure, without the warrant, were lawful and proper. And that, after all, is the real point.

To avoid useless repetition, it is only necessary to repeat at this juncture part of what has been said; namely, that the police had immediately prior to and on the day of the raid heard several hundred bets on horse races being taken. When they got inside the place, bets were still coming in, and several were taken over the telephones by police officers. In these circumstances, we think there was justifiable cause for the arrests. The information the police had was sufficient to put them on notice the place was being used for gaming. This was enough to make the subsequent entrance and arrests lawful. The arrests being lawful, it was equally lawful to search the place and to use the incriminating things found as evidence in the prosecution; for "when a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution." Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 287, 69 L.Ed. 543, 39 A.L.R. 790; and see, also, Marron v. United States, 275 U.S. 192, 198, 48 S.Ct. 74, 72 L.Ed. 231; where the court said, in a seizure under the National Prohibition Act, the authority of the officers to search and seize the things relating to or constituting the offense extends to all parts of the premises used for the unlawful purpose.

Here the incriminating evidence which the motion sought to exclude was taken from the premises in which the alleged crime was committed at the moment of arrest. In our opinion, the arrests were lawful, and the evidence of crime seized by the police not within the protection of the provision of the Constitution prohibiting search and seizure.

Third. Was the evidence obtained by wire tapping competent? Counsel tell us it was not because, as the police admittedly were not able to identify the voices using the telephones and therefore not able to fasten the conversations on any one of appellants, it was as to all appellants hearsay evidence; and, being hearsay evidence, was inadmissible.

We think this argument overlooks the purpose for which the evidence was offered and for which clearly it was admissible. The purpose was to show that the Mather place was a gambling place and that it was then being used for gambling. It was competent for this purpose. It was not offered to fasten the conversations on any particular person, but in this connection it is not improper to point out that at the time the officers heard the betting; that is to say, just before the raid, all of appellants were present in the room. The place was being conducted as a gaming place and on an extensive scale. The evidence, therefore, of the character of the place, coupled with appellants' presence, was a circumstance to be considered by the jury in connection with the charge that they were all conspiring to violate the law; and in this respect the jury had a right to consider the evidence, in connection with all the other evidence in the case, in determining their guilt or innocence.

After listening in (which the Supreme Court has said they may do—Olmstead v. U. S., 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376), the police went immediately from one room in the building to the other in which appellants were found; and, after breaking through several doors, discovered them all in their shirtsleeves in retreat at the far end of the adjoining room. This, also, was a circumstance which the jury could consider together with the things found there tending to show the character of the place and that the law was being violated. The case, therefore, is not one in which evidence of a telephone conversation is introduced against a particular person. In such case it is, of course, necessary to establish the identity; but here the evidence, as we have seen, was offered to show that the place in question was a gambling place and that some or all of the persons found therein

were engaged in taking bets in violation of law. For these purposes it was proper.

The trial court told the jury that, in order to convict, it was necessary they should find, as to each individual defendant, that he participated in, or took part in carrying on the unlawful enterprise. This was sufficient to confine the evidence to the particular purposes we have pointed out.

Fourth. Appellants object to the admission of evidence of certain declarations made by one or more of the alleged coconspirators out of the presence of the others. The ground of objection is that, until the existence of the conspiracy is established prima facie, evidence of declarations is inadmissible. One of the statements admitted was that of the appellant Beard, who at the time of the arrest, and when the persons found in the premises were being taken to the police station, said to a police officer, "I have got a lot of valuable property here, and I want to see what becomes of it and what you do with it." Another was that Beard several days after the arrests had asked the officer to forget the statement. Another, that appellant Heck, at the police station immediately after the arrest, was asked by one of the officers, "How much does Sam pay you up there a week?" and replied, "Twenty-five Dollars." It is now insisted, as to all these statements, that they were made after the conspiracy was at an end; and hence were not admissible against the others. Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. But this ground of objection is made for the first time in this court. In the court below the objection was grounded on the theory that no conspiracy had been proved; and in response to this the court told the jury that no declaration made by one alleged conspirator could be used against another until they were satisfied a conspiracy existed. The objection, therefore, if otherwise valid, would now come too late. But, aside from this, the declarations, except against the persons making them, were of no importance. There is nothing in them which connects any other or others of appellants with the alleged conspiracy.

Fifth. Over the objection of appellants, the government was permitted to introduce evidence of police raids made on gambling places located in different parts of Washington city. It was the theory of the government that each of these branch places was connected by telephone with the gambling room in the Mather building, and that appellants conspired to maintain the places for the purpose of gambling. In support of its contention the government introduced in evidence the sheet of paper to which we previously referred (Exhibit 48), found at the time of the raid. On it were the words and figures we have already made reference to; that is to say, there was a single column containing certain numbers and opposite each the number of a Washington telephone. The government then offered evidence to show the location of the places in Washington in which these telephones were installed; and it also offered evidence to show that the other numbers were the symbols by which persons in the Mather building could identify the place at which the telephone call originated.

The theory was that the Mather building was the central office of a widespread conspiracy to violate the gaming laws, and that there was a tie-up between the main office and a number of branch offices. The telephone conversations which the police overheard, it was claimed, demonstrated that each of the branch offices had a code number known to the alleged conspirators, and that the branch was kept in constant communication with the main office for the purpose of making and recording bets. For example, on October 2d, 1934, an unidentified person in the Mather building telephoned Metropolitan 6056. This telephone was shown to have been located at 702½ Fifth Street N. W., Washington. The person answering said, "Hello, this is 22." (22, the government says, was the code number.) Then followed statements giving information concerning horse races to be run that day. Later in the day Metropolitan 6056 would call the Mather building and, when answered, would say, "This is 22," and then would follow a number of bets. Precisely this same thing occurred as to all the places as to which evidence of raids was admitted. The police overheard many of these calls, and recorded the subsequent conversations having to do with bets on the races. When they entered the gambling room in the Mather building, they found slips recording bets on races being run that day; and each slip was marked in the lower right-hand corner with a code number corresponding to those which had been given over the telephones, and corresponding likewise to those found on the guide sheet (Exhibit 48) to which we have referred. These slips corresponded with

the police memoranda of bets they had listened to on the telephones, and by reference to the guide sheet (Exhibit 48) the place at which the bets originated is determined.

At the bottom of the guide sheet (Exhibit 48) was a number which had been scratched out. As the evidence shows that this number corresponded to a place which had been raided by the police the day before, the fact it had been taken off the list is strong proof of the use to which the paper was put—as well as the time period to which it related. Appellants insist that it was error to admit evidence that these places were gambling places, principally on the ground that no conspiracy had been proved and on the further ground that the evidence did not connect any particular one of the appellants with any of the places.

The evidence admitted shows that the first of the raids occurred in May, 1934. This was at 514 Tenth Street N.W. The code number of this place was 16. The police had testified that they heard bets being made from No. 16 during several hours immediately preceding the raid. In the raid in May the police had found a large gambling establishment in full operation, and the evidence of this the court admitted for the purpose of showing the general character of the place. Similar evidence was admitted as to raids on 1405 L Street N.W., shown on the paper to be code No. 10; and 605 Pennsylvania Avenue N.W., code No. 11; 742½ Ninth Street N.W., code No. 27; 722 Thirteenth Street N.W., code No. 19; 1319 Wisconsin Avenue N.W., code No. 12; and 702½ Fifth Street N.W., shown as code No. 22. This last-numbered place was raided by the police the day before the raid on the Mather building, and, as we have pointed out, at the time of the latter raid the code No. 22, though written on Exhibit 48, had been scratched off. That this connected up the two places almost to the day of the arrests we think is apparent; and, while none of the evidence directly connected any certain one of the appellants with these branch places, it was introduced and properly admitted in connection with other testimony as tending to throw light upon the charge that persons found in the premises in the Mather building were then and there engaged in gambling as part and parcel of a conspiracy to carry out a general plan of gambling covering fairly well the city of Washington. In this view it was not essential that the degree of participation of each should be shown, for it has been said many times that one, knowing that others have combined to violate the law, who himself does any act to assist, is as guilty as the others; and his guilt may be shown as well by circumstantial evidence as by direct evidence. All of the branch raids occurred within the period covered by the indictment; and, if the evidence of the police as to the conversations they later overheard on the telephones is true, all such branch places were still actively engaged in operating when the raid on the Mather building occurred.

This is one of those cases in which of necessity the government was required to rely largely upon circumstantial evidence, and in such a case all relevant circumstances which throw light upon the probability of guilt are admissible. All of appellants were found in a room devoted exclusively to gaming, and the room itself was barred to the public. While appellants were there, gambling was in progress. In the circumstances, evidence tending to show the method and plan of carrying on the business cannot be said to be improper. Allen v. United States (C.C.A.) 4 F.(2d) 688.

Sixth. Exception was taken to a statement of the court to the jury of the reason for their confinement during the trial. The language objected to was as follows: "You understand, of course, by this time in each of these cases which you try here the trial is to be had on the evidence that is produced in open court. In a case like this there is often a lot of public interest, public curiosity about the proceedings and what is going on. There are a large number of defendants here who doubtless have a great many friends who are very much interested in this matter. In a situation of this kind, even without any wrong intention on the part of anybody, there is always a liability of information being given to the jury that they ought not take into consideration. Besides that, there are occasions when things happen that become a little embarrassing to the jury; and ofttimes make it necessary for the court to declare a mistrial and have the whole thing gone over. To prevent that possibility of anything of that sort, and in order to keep the jurors' minds free of any information that they ought not to have, it seems wise to me in this case to

allow you all to remain in the care of the court."

Objection was made to this statement of the court, and the court replied: "I am sure that I made no such impression because I said that the public are interested and are curious about these things and these gentlemen who are on trial here have a large number of friends who may also undertake to talk to the jury."

We do not think this language of the court could have prejudiced appellants. Obviously, what was first said by the court was entirely proper. When objection was made, the judge explained that he had intended no such impression as counsel implied, and added the language now specially objected to; namely, that the defendants had a large number of friends who might undertake to talk to the jury. This remark might, perhaps, better have been left unsaid; but in our view nothing we have repeated here can be said to have prejudiced appellants.

■■ Nor is there any greater substance to the exception taken to the remarks of government counsel that he was willing to submit the case to the jury without argument.

■■ Seventh. This brings us to the question whether appellants' motion for a directed verdict should have been granted. We have examined the evidence with great care, and, from what has already been related, it is quite clear that the evidence shows there was conducted in the Mather building a central gambling establishment operated by means of telephone communications with numerous subsidiary gambling places throughout the business section of the city. One of the appellants, Hutchins, paid the rent. Another, Beard, admitted that much of the personal property in the place belonged to him. Another admitted he worked there. A number of others were frequently seen going to and from the place, and all were found in the place under circumstances indicating participation in what was going on.

When the raid occurred, all of appellants were in their shirtsleeves, their coats hanging in an outer room; and, when arrested, none offered any explanation of his presence there. When the officers made the arrests, the telephones were ringing, and bets were being transmitted. Slips showing the taking of bets within an hour or so of the raid, written in nine different handwritings, were found. In these circumstances, and without any testimony in appellants' behalf to explain their presence in the room, the jury had a perfect right to conclude, as to each of them, that he was engaged in the business then being conducted there.

This is a case like that of men found at midnight at a blockade still in full operation, located in the depths of a swamp. Their presence at the place of the crime may be accidental and innocent, but the inference is that it is not, and calls for explanation; and, if they offer none and the jury convict, an appellate court would not be justified in saying that the inference is not sufficient to sustain the conviction. "Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character." Bilokumsky v. Tod, 263 U.S. 149–153, 44 S.Ct. 54, 56, 68 L.Ed. 221.

■ Eighth. Exception was taken to an instruction which told the jury that the passage or transfer of the money was "not an essential to the making of a bet." We have so construed the statute. Miller v. United States, 6 App.D.C. 6, 13. Other exceptions to the failure to give instructions asked by appellants (Nos. 7, 9, and 18) need be noticed only to say that No. 7 was sufficiently covered in the general charge, and Nos. 9 and 18 do not correctly state the law in the District of Columbia.

■■ Ninth. This leaves only for consideration the denial of the motion for a new trial and in arrest of judgment based on the allegation that the jury had read or seen the headline of a newspaper and that this influenced them. The offending headline was said to have conveyed to the jury the information that gamblers were betting ten to one there would be an acquittal. Affidavits of three of the jurors were filed to show that the jury, in taking a ride between sessions of the court, had seen this headline and discussed it in the jury room, and were influenced by it. The trial judge, after a full hearing, denied the motion. Ordinarily denial of motion for a new trial or of motion in arrest of judgment is not reviewable. Sutton v. United States (C.C.A.) 79 F.(2d) 863. There is nothing here on which to base an exception to the rule.

Affirmed.