## PLUMMER v. UNITED STATES.
### No. 10497.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 18, 1951.

Decided March 8, 1951.

T. Emmett McKenzie, Washington, D. C., for appellant.

Richard M. Roberts, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty., and Arthur J. McLaughlin and Joseph M. Howard, Assts. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before EDGERTON, PRETTYMAN, and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant was indicted jointly with one Harry S. Kopel in three counts, (1) for setting up and keeping "a certain gaming table for the purpose of gaming"; (2) for setting up and keeping "a certain place for the purpose of gaming"; and (3) for unlawfully betting and gambling and wagering money upon the result of a horse race.[1] Kopel was acquitted on all counts. Appellant was acquitted by direction of the court on the second count. He was convicted by the jury on the first and third counts. On this appeal he contests the validity of his conviction on the first count; he does not contest the conviction on the third count.

Appellant's position is that a gaming table for the purpose of gaming, within the meaning of the statute, means a physical device or contrivance of some sort and does not mean the mere taking of a bet on a race; that there was no evidence that appellant set up or kept such a device or contrivance; that, in fact, there was no evidence that appellant took or made a bet, the most that was shown being that he acted as an accommodation intermediary; and that the trial judge erred when he told the jury: "The essence of this offense is the furnishing of facilities for gaming activi-

1. Kopel was also indicted alone on two additional counts and was acquitted on them.

ties. * * * Facilities are not limited to physical means or devices.

" * * * A facility is anything that promotes the ease of any action, operation, transaction, or course of conduct or opportunity, as, for example, where a person holds himself out for the purpose of receiving bets. He provides facilities for gambling, even though he be without any physical equipment, such as the table or the like. * * *"

We are forcefully struck at the outset by the difference between two provisions of the law. To set up or keep a gaming table or a place for the purpose of gaming is a felony.[2] To bet or make books on horse races is a misdemeanor.[3] The former is punishable by imprisonment for five years, no punishment by fine being permitted. The latter is punishable by a maximum of a fine of five hundred dollars and imprisonment for ninety days. Conviction for *felony carries consequences which conviction for misdemeanor does not carry.* Congress obviously had in mind some wide difference between the two offenses when it attached to them such widely different consequences.

The difference between these two provisions of the gambling laws first received the attention of this court in 1895. Chief Justice Alvey wrote an exhaustive opinion in Miller v. United States.[4] Going back to the early English cases, he pointed out the difference between the operation of tables or places set up and kept for the *purpose of gambling* and "the simple acts of betting, gambling or making books". In this jurisdiction the former was outlawed by an Act of 1883[5] and the latter

by an Act of 1888.[6] The Act of 1883, Chief Justice Alvey said, had for its object "the suppression of gaming tables and places set up and kept for gambling, and to which all persons are invited to resort for the purpose of gaming." "The offence created and intended to be punished by the act of 1883," he said, "is not only different, but is much graver in its character than the offence provided against in the subsequent acts; * * *." The great evil and vice in the gaming table or place, he further said, is "in the seductive allurements held out to people, young and old, to frequent the gaming table, or the gambling device, and to indulge in excessive betting, and thereby become the victims of the wily and scheming professional gambler." Many subsequent cases have involved the statute which was originally the Act of 1883, but all of them appear to have involved a physical device or a designated place.[7] Thus, the cases involved a gaming table for shooting craps; a bucket shop; a cigar store kept by the accused, at which he took bets on races, using betting slips, betting memoranda, etc.; fully equipped gambling establishments; numbers slips; claw machines; an established "club"; two rooms *completely equipped with racing slips and forms and a shortwave radio;* etc.

There is ample internal evidence in the statute itself that a gaming table means a physical device. The prohibitory section reads: "Whoever shall in the District set up or keep any gaming table, or any house, vessel, or place, on land or water, for the purpose of gaming, or gambling device commonly called A B C, faro bank, E O,

2. D.C.Code § 22–1504 (1940).

3. D.C.Code § 22–1508 (1940).

4. 6 App.D.C. 6.

5. 22 Stat. 411.

6. 25 Stat. 94.

7. Nelson v. United States, 1906, 28 App. D.C. 32; Wade v. United States, 1909, 33 App.D.C. 29, 20 L.R.A.,N.S., 347; Swan v. United States, 1923, 54 App.D. C. 100, 295 F. 921; Brown v. United States, 1929, 59 App.D.C. 57, 32 F.2d 953; Zerega v. United States, 1929, 59 App.D.C. 67, 32 F.2d 963; Kelleher v.

United States, 1929, 59 App.D.C. 107, 35 F.2d 877; Beard v. United States, 1936, 65 App.D.C. 231, 82 F.2d 837; Forte v. United States, 1936, 65 App.D.C. 355, 88 F.2d 612, 105 A.L.R. 300; Boosalis v. Crawford, 1938, 69 App.D.C. 141, 99 F. 2d 374; Donald v. United States, 1939, 70 App.D.C. 14, 102 F.2d 618; Sesso v. United States, 1942, 77 U.S.App.D.C. 35, 133 F.2d 381; Washington Coin Mach. Ass'n v. Callahan, 1944, 79 U.S.App.D. C. 41, 142 F.2d 97; Warde v. United States, 1946, 81 U.S.App.D.C. 355, 158 F.2d 651.

roulette, equality, keno, thimbles, or little joker, or any kind of gaming table or gambling device adapted, devised, and designed for the purpose of playing any game of chance for money or property, or shall induce, entice, and permit any person to bet or play at or upon any such gaming table or gambling device, or on the side of or against the keeper thereof, shall be punished by imprisonment for a term of not more than five years."

Thus, the section refers to betting or playing "at or upon any such gaming table or gambling device, or on the side of or against the keeper thereof". "At or upon" clearly refers to a physical thing, and so does "the keeper thereof". The statutory definition of gaming table [8] reads: "All games, devices or contrivances at which money or any other thing shall be bet or wagered shall be deemed a gaming table * * *." Here again the phrase "at which" clearly indicates a physical device of some sort. Almost all "games" involve physical paraphernalia of some sort; dice, chips, cards, wheels, tables, tickets or slips, etc. To set up or keep such devices for the purpose of gaming is to set up or keep a game at which money can be bet, within the meaning of the gaming table statute; for example, a person could set up and keep a poker game by maintaining a table, chips and cards.

Other sections of these statutes (Title 22 of the District of Columbia Code) use the word "device" and clearly indicate that a physical object is meant. Section 1501 refers to "any ticket, certificate, bill, token, or other device". Section 1408, dealing with vending machines, coin-box telephones, etc., refers to "any token, slug, false or counterfeit coin, or any device or substance whatsoever intended or calculated to be placed, deposited, or used in the operation of" such machines. Section 1502, dealing with lotteries, refers to "any ticket, certificate, bill, slip, token, paper, writing, or other device".

The general rule is stated in American Jurisprudence[9] as follows: "By the term 'device,' as that term is generally employed in such statutes, is meant the tangible means, instrument, contrivance, or thing with or by which money may be lost or won, as distinguished from the game itself." Cases are cited to support that proposition, and we find no intimation to the contrary elsewhere. One of the cases cited is squarely in point. In Cooper v. City of Miami [10] the defendant took bets on horse races but used no tangible means in his operation. The court pointed out that there were two ordinances, one directed at setting up and keeping a gambling device and the other directed at taking bets. The court said that the prosecution did not prove the offense of which the defendant was accused (setting up and keeping a gambling device) but at most proved an entirely different offense punishable by the other ordinance. The court said that the "obvious meaning" of the statute against keeping a gambling device was that some tangible means must be involved.

With the foregoing considerations in mind we examine the evidence in this record.

Hammel's is a downtown Washington restaurant and bar, frequented principally by business men and Government officials and employees. Kopel was part-proprietor and Plummer was a waiter in that restaurant. Two Department of Justice operatives, a man and a woman, testified for the prosecution. We follow their testimony, including what they said on cross examination, and ignore what appellant said. They went into the restaurant at a late lunch hour on March 17, 1949, took a table, and ordered lunch. Then they brought out and laid on the table a scratch sheet. The waiter, Plummer, made a vague remark about the races. After eating, the woman called to Plummer and asked if he could take a bet for her on the second race. He said, "I will see," looked around the room, and said he could. She gave him a ten-dollar bill. He took it to a man standing at the bar and said, "Are you going across the street, Doc?" Doc said "Yes",

8. D.C.Code § 22–1507 (1940).

9. 24 Am.Jur. § 31.

10. 1948, 160 Fla. 656, 36 So.2d 195.

took the bill, went out of the restaurant, crossed the street, and handed the money to another man. In about twenty minutes "Doc" returned, handed Plummer two ten-dollar bills, and Plummer brought them to the woman, still at the lunch table, and told her the horse had won. That was the first incident. A few days later the two operatives returned to the restaurant, ordered lunch, and the woman asked Plummer whether there was anyone there to take a bet. Plummer replied that there was not. After lunch the operatives noticed a man, known to them as "F. B." or "Fish",[11] come into the restaurant. Thereupon Plummer came to them and said that someone was then there to take a bet. The woman gave him two dollars, and he took it across the room and gave it to "Fish", who left the restaurant. That was the second incident. Upon the third occasion the man operative went to the restaurant alone, ordered his lunch and ate it. When he finished he asked for his check, which was $1.70, laid a five-dollar bill on the table, together with a scratch sheet with a ring drawn around the name of a horse, and told Plummer to get up a bet of three dollars on that horse. The operative had seen "F. B." come into the place. Plummer spoke to "F. B." and said to the operative, "O.K., he is here now." Both operatives agreed that Plummer at no time offered to take a bet or suggested the betting.

Plummer concedes, as we have said, that he took a bet or aided in making a bet; he does not contest his conviction on that charge. He was acquitted of keeping a "place" for the purpose of gaming.

■ The question is whether there was any evidence upon which a jury could find beyond a reasonable doubt that Plummer set up or kept a gaming table for the purpose of gaming. We can find no such evidence upon this record. That the restaurant itself was not a place kept for gambling is established for the purposes of this case by two facts: (1) Kopel, the proprietor, was acquitted on all counts;

and (2) Plummer, the waiter, was acquitted of keeping a place for gambling. So conviction would have to rest upon a finding that Plummer, the waiter, set up and kept for the purpose of gaming the tables upon which he waited. There is no shred of evidence to that effect. The operatives went in and ordered lunch. The waiter did not suggest that they place a bet. As a matter of fact, he himself did not make the bet. He acted as an intermediary, at the request of a customer, between the customer and a person who would take a bet. And, when that person was not present, the waiter said no bets could be placed. If the waiter had set up and kept the table for the purpose of gaming, why would he have told a prospect that there was no one there to take a bet? As a matter of fact, at no point either in the trial court or in this court has the Government claimed that Plummer set up or kept the luncheon table as a gaming table for the purpose of gaming. Moreover, the waiter was not acting as an aider, abettor or accomplice to Kopel in the gaming table charge, because Kopel was innocent. It seems to us that a conclusion that the waiter, independently of the proprietor of the place, was maintaining for the purpose of gambling the tables upon which he waited, is beyond the possibility of reasonable conclusion upon the facts in this record. That he was complaisantly amiable is abundantly shown, but that is not enough to constitute a felony under this statute.

The case was tried upon a consistent theory throughout. The prosecutor devoted the major part of his addresses to the jury to his case against Kopel; as to appellant Plummer he said, in his opening address, twice in his closing, and again in his rebuttal, merely that Plummer "accepted these three bets", "accepted bets", was "guilty of accepting a bet". At the end of his case-in-chief, when a motion for judgment of acquittal was being argued, the prosecutor told the court that his theory on Count 1 was that Plummer was aider and abettor to Kopel and therefore was guilty as a principal. The court

11. The testimony of the two operatives is confused as to this person.

instructed the jury, as we have indicated, that a gaming table does not necessarily involve a physical thing. If the court had accepted the prosecutor's theory as to Count 1, a judgment of acquittal would necessarily have been entered as to Plummer on that count, because Kopel, the alleged principal, was acquitted.

As to the view that Plummer was guilty of setting up and keeping a gaming table because he took bets on a horse race, without any further proof, we think, as we have indicated, that view erroneous. An accused cannot be guilty of keeping a gaming table if he merely took a bet; he cannot be convicted of a felony if the sum total of the evidence is that he committed a misdemeanor.

So much of the judgment of the District Court as applies to Count 1 of the indictment is reversed. The District Court should grant the motion for judgment of acquittal on that count. The sentence included in the judgment as entered was a general sentence on the two counts, 1 and 3, and was imprisonment for a period of four (4) months to twelve (12) months. That sentence cannot stand as a sentence on Count 3 alone, since the maximum imprisonment upon that count is ninety days. The portion of the judgment fixing sentence will, therefore, be set aside, and the District Court should enter sentence upon the conviction on Count 3.

Reversed in part and remanded with instructions.