Julius SILVERMAN, Appellant,

v.

UNITED STATES of America, Appellee.

Meyer SCHWARTZ, Appellant,

v.

UNITED STATES of America, Appellee.

Robert L. MARTIN, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 15186, 15258, 15259.

United States Court of Appeals

District of Columbia Circuit.

Argued Sept. 18, 1959.

Decided Feb. 4, 1960.

Petition for Rehearing En Banc Denied March 8, 1960.

Mr. Edward Bennett Williams, Washington, D. C., with whom Mr. Thomas A. Wadden, Jr., and Miss Agnes A. Neill, Washington, D. C., were on the brief, for appellants.

Mr. Thomas A. Flannery, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Appellants were jointly indicted on four counts charging, in one respect or other, violation of the District of Columbia Code proscribing gambling,[1] and on a fifth count which charged they had engaged in the business of accepting wagers without having paid the special tax required by the Internal Revenue Code.[2] They were acquitted of the charges in the fourth and fifth counts. Each appellant was sentenced to serve on the first and third counts, a term of imprisonment of nine months and to pay a fine of $500, and to serve on the second count a term of imprisonment of twenty months to five years. The sentences are to run concurrently. All were admitted to bail pending appeal.

---

1. D.C.Code, §§ 22–1502, 1504, 1505, 1508.

2. See generally Title 26 U.S.C. §§ 4401–4423, 7262 (1958).

## I.

■ Although appellants ask that the judgments of conviction be reversed as to the first and third counts, they particularly insist that a judgment of acquittal must be directed as to the second count.[3] They argue as to the latter, that the conviction "was vitiated by the absence of any physical device or place to which the public was invited."[4]

We reject this contention on the authority of Beard v. United States.[5] The only substantial difference between the "syndicate" operation in the Beard case and that conducted by these appellants is that Beard involved betting on horse races whereas the betting here was on prize fights and baseball games.

Plummer v. United States,[6] relied upon by appellants is clearly distinguishable on its facts as to appellant Plummer. The latter, a waiter in a well-known restaurant, simply placed bets for his customer with a "bookie" who sometimes frequented the place. We said the waiter was merely an accommodation intermediary. He had not set up the luncheon table as a gambling device or gaming table, we pointed out. The waiter's "complaisant" amiability did not make of him a felon.

Here, on the other hand, the evidence clearly shows that these three appellants were operating a betting office where they received wagers, established records of the wins and losses and kept accounts of their operations. That their activities were conducted by telephone is of no moment whatever. It is true that the public was excluded from their gambling office headquarters, but there is no requirement in the statute that the premises be open to the public. The statute defines as a felony not only the setting up of a gaming table, but the keeping of any house or place for the purpose of gaming. It reaches any operator who would permit any person to bet "on the side of or against the keeper thereof." The facts show that appellants accepted bets against themselves. The photographic exhibits in the record before us disclose a scene of operations designed completely to facilitate the activities in which appellants were engaged.

We have examined the betting slips, the tally of wins and losses, and the records of the "line" of betting odds on various sports events. Bets ran into the thousands of dollars, one, for example, of $5,000 on April 23, 1958, that Detroit would win over Kansas City. Some 55 bet slips were recovered which were interpreted in the evidence as disclosing total bets in excess of $37,000 which were involved in the play on April 30, 1958. For part of one day "the house" —appellants'—paid out bets to players who had won the sum of $14,454, while appellants received a profit for that part day of $13,474. We have more particularly hereinafter noticed and taken account of other physical aspects of the major gambling operation conducted by the appellants. It would be sheer sophistry to say that some poolroom operator taking bets on horse races would be guilty under section 22–1504, or some numbers player could be convicted of accepting plays in the rear of a lunch room[7] while these "big time" gamblers could go free because they conducted their activities over the telephone. The law com-

**3.** This count charged that appellants "set up and kept a gaming table at premises located at 408 Twenty First Street, Northwest, for the purpose of betting on the results of baseball games, prize fights and boxing matches." Compare D.C. Code, § 22–1507 (1951) which provides: "All games, devices, or contrivances at which money or any other thing shall be bet or wagered shall be deemed a gaming table within the meaning of sections 22–1504 to 22–1506; and the courts shall construe said sections liberally, so as to prevent the mischief intended to be guarded against."

**4.** This quotation is taken from appellants' brief.

**5.** 65 App.D.C. 231, 82 F.2d 837, certiorari denied 1936, 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382.

**6.** 1951, 88 U.S.App.D.C. 244, 189 F.2d 19.

**7.** See cases collected at footnote 7 in Plummer v. United States, supra note 6.

mands no such absurd result nor do our cases suggest it.

## II.

■ Appellants also claim that a new trial must be granted in the interest of justice pursuant to Fed.R.Crim.P. 33, 18 U.S.C. in that the guilty verdict as to the first three counts is "clearly and irreconcilably inconsistent" [8] with their acquittal under counts four and five. They claim that an acquittal on the fourth count amounts to a jury finding that appellants did not accept wagers and that they "could not be guilty of keeping a gaming table and maintaining a gambling premises * * * unless they accepted wagers." In like vein, since "the evidence is uncontroverted" that appellants did not pay the tax required by the Internal Revenue Code of persons engaged in accepting wagers, "their acquittal under count five amounts to a finding that they did not accept wagers," and "precisely the same activities were relied upon under all five counts of the indictment."

■ Again, we reject appellants' claim. As Judge Keech pointed out in United States v. Daigle,[9] rational consistency in a jury's verdict on each of several counts is not necessary. We need not here make further reference to the authorities he cited and which well establish the point.

## III.

■ On April 30, 1958, Metropolitan police officers and special agents of the Intelligence Division of the Internal Revenue Service converged on the row houses 402-4-6-8-10 Twenty First Street, N.W., roughly across from the State Department. Appellant Silverman came out of No. 408. Silverman was placed under arrest by an officer who identified himself, informed Silverman that he had a warrant for his arrest and that the officers had a search warrant authorizing a search of the premises at No. 408–21st Street. Silverman produced a key ring, selected a key to fit the front door and unlocked the door. Officers with arrest warrants for Schwartz and Martin entered the premises and went to the second floor where the latter appellants were located in the front room. Schwartz and Martin also had keys to the front door of No. 408, and each had a key to a special lock on the door of the room in which they were found.

This was no private dwelling, but a betting business office. Large sections of black cloth covered the windows in that room. Two tables, side by side, filled the wall space between the front wall of the room and a closet. On the tables were three telephones, bearing numbers DIstrict 7-3554, DIstrict 7-3555 and DIstrict 7-3556, equipped with an automatic changeover device. Covering the entire wall between No. 406 and No. 408, behind the tables and the telephones, was a large rug.

Other equipment included pads of paper, pencils, a filing cabinet, "line" sheets listing sports events and betting odds quoted with reference thereto, a bundle containing 55 bet slips representing bets which had been accepted on various baseball games played on April 30, 1958, and two slips on which had been recorded bets accepted on a prize fight.

The total bets thus recorded ran to $37,950. The "house" was shown, according to the testimony of an expert, to have had total winnings of $27,928 derived from various plays over part of the day.

Yet other exhibits of record included a tally sheet of bettors, or players who had telephoned in their bets. Amounts listed opposite their names in certain cases had been ringed in red pencil.

8. In this paragraph we again quote from appellants' brief.

9. D.C.D.C., 149 F.Supp. 409, 413, 414 and cases cited, affirmed 1957, 101 U.S. App.D.C. 286, 248 F.2d 608, certiorari denied 1958, 355 U.S. 913, 78 S.Ct. 344, 2 L.Ed.2d 274. And see United States v. Meltzer, 7 Cir., 1938, 100 F.2d 739; Williams v. United States, 4 Cir., 1957, 244 F.2d 303.

Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180, relied upon by appellants is not to the contrary.

Such entries indicated losses to the house, or as the expert put it, amounts owed by the house to a particular named player.

Over the 2½ hours or so as the officers listed the results of their search, the telephones rang continuously. The calls were accepted by the police who supplied inquirers with the odds on such sporting events as were made the subject of the calls. Some of the callers asked specifically for one or another of the appellants and were given the information that they were not "available" so that the caller hung up.

Inspector Layton, testifying as an expert, traced out for the jury the significance of the bets, the relationship of $600 put up to win $500, for example; how odds were to be interpreted if a player put up $1,000 to the "house's" $1,350; what it meant if a player was told to "pick 'em," and, generally, how the bets were handled. Also in the room was a perforated metal basket bearing charred remains of burned paper.

No special purpose will be served by more extended reference to the scope of the betting operations as described by the officers. For how long and at the rate of just how many thousands of dollars per day the enterprise had continued could only be a matter of surmise. It was clear, however, that Martin had a year's written lease to No. 408 which had been executed October 18, 1957. He continued until November, 1958, to pay the rent to Woodward and Norris. Detailed testimony as to betting activities became available at trial as to the period of April 21, 1958 to April 30, 1958 during which the gambling establishment was under surveillance for several hours on each of several days.

All such evidence clearly and overwhelmingly proved that the three appellants had maintained and operated that gambling establishment over the period named. There would be no question as to affirmance of their convictions on all three counts before us except for the last remaining predicate for this appeal. We thus come to appellants' contention that all evidence should have been suppressed.[10]

### IV.

Appellants claim that the officers acted in violation of appellants' Fourth Amendment rights and in violation of section 605 of the Communications Act of 1934, 47 U.S.C.A. § 605.

■ There can be no question that the affidavits before the Commissioner completely satisfied the requisite probable cause for the issuance of both the arrest warrants and the search warrant,[11] if the evidence was competent.

Here Metropolitan Police Inspector Layton about March 15, 1958, went to Woodward and Norris who were the owners of No. 410–21st Street, a vacant row house immediately adjoining No. 408. He asked for a key to No. 410 and for permission for his men to make observations from that house. His requests were granted.

■ Officers thereafter, on April 21, 1958, saw the three appellants leave No. 408. The next morning they reentered No. 408. The officers had inserted an antenna spike about 11¾ inches long under the baseboard of a room in No. 410. By connected ear phones, they then were able to overhear the appellants conducting their betting business, making telephone calls to Chicago, New York City, Miami, Columbus and elsewhere.

---

10. Appellants were first indicted in July, 1958. They moved for suppression of all evidence seized at No. 408 and also for the suppression of all conversations which had been monitored by police and Treasury officers from No. 410–21st Street, the row house next door. Their motion was denied. United States v. Silverman, D.C. D.C.1958, 166 F.Supp. 838. The trial went forward thereafter on a superseding indictment. Judge Jackson having accepted and relied upon Judge Holtzoff's earlier ruling, the officers over objection were permitted to testify to what they heard said by appellants in No. 408.

11. Giordenello v. United States, 1958, 357 U.S. 480, 485, 486, 78 S.Ct. 1245, 2 L. Ed.2d 1503.

So it went, on each of several succeeding days, with two of the appellants doing the talking in No. 408 on several occasions all three at other times. At times, an officer could overhear the appellants by merely placing his ear or a glass tumbler against the wall, it was testified.

Had the officers utilized a device such as a detectaphone, there would seem to be no basis for complaint. Goldman v. United States [12] held such evidence competent. Its use to secure evidence by eavesdropping on Goldman's telephone calls violated neither the Fourth Amendment nor 47 U.S.C.A. § 605. The Supreme Court in Goldman was asked to overrule Olmstead v. United States,[13] but it refused to do so.

Here the antenna spike was said to have penetrated the party wall about half way. The record indicates that Judge Holtzoff and Judge Jackson might well have concluded that there was no physical trespass upon appellants' "half" of the party wall, since the wall itself was some thirteen to fourteen inches in thickness. We are asked to say that the spike might have penetrated $7\frac{1}{8}$ inches through the wall so that a "trespass" occurred by as much as $\frac{5}{16}$ths of an inch.

At stake is the Government's right to use the evidence procured through such electronic eavesdropping, in contrast with the immunities [14] secured to the appellants by the Fourth Amendment. We are unwilling to believe that the respective rights are to be measured in fractions of inches.

This is not the revolting "bugging" of the bedroom of man and wife, as in Irvine v. People of State of California.[15] Nor is it a case of wire-tapping.[16] Rather, in principle, it is not *such* unlawful search and seizure as is proscribed by the Fourth Amendment, On Lee v. United States,[17] and equally there was no interference with any communications system within the proscription of 47 U.S. C.A. § 605.[18]

Appellants argued to us that the Supreme Court as now constituted would surely accept their contentions. They asked accordingly that we anticipate that eventuality and now rule in their favor. It is not our duty to speculate as to what the Supreme Court will say in the future; it is our duty to follow the Court's past rulings as we understand them. Under the existing authorities as we read them, the appellants failed to sustain their burden of demonstrating either to Judge Holtzoff or at trial that their Fourth Amendment rights were violated, or that the exclusion of the eavesdropped telephone conversations was required by 47 U.S.C.A. § 605. They have not convinced us that either judge erred.

Affirmed.

WASHINGTON, Circuit Judge (dissenting).

Police use of an electronic eavesdropping device produced the essential evidence in this case. I would exclude evidence so obtained, along with any addi-

12. 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.

13. 1928, 277 U.S. 438, 48 S.Ct. 564, 72 L. Ed. 944.

14. Cf. McGuire v. United States, 1927, 273 U.S. 95, 99, 47 S.Ct. 259, 71 L.Ed. 556; United States v. Lee, 1927, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202.

15. 1954, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561; even there the Court refused to find that the conduct or reception of the evidence violated 47 U.S.C.A. § 605. Id., 347 U.S. at page 131, 74 S.Ct. at page 382.

16. Benanti v. United States, 1957, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126, and cases cited, e. g., Nardone v. United States, 1937, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 and 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

17. 1952, 343 U.S. 747, 751, 72 S.Ct. 967, 96 L.Ed. 1270. There the Court pointed out that Goldman v. United States, supra note 12, had left open the effect of an earlier trespass "in order to install a listening device within the room itself."

18. 343 U.S. at page 754, 72 S.Ct. at page 972.

tional evidence which was its fruit, and would reverse the convictions.

The police gained entrance—quite legally—to the row house next to that occupied by appellants. They then carefully probed the brick party wall between the two houses in search of an advantageous spot for the insertion of their eavesdropping device—a needle or spike about twelve inches long, connected to an amplifying circuit. The testimony indicated that the spike, in order to serve its purpose adequately, had to come in contact with a solid object capable of resonance. Mere insertion in the plaster or brick of the wall would be ineffective. The desired sound reception was obtained by inserting the spike about seven inches into the party wall, under the baseboard, at a point where the wall contained the metal heating duct for appellants' house. The heating duct was an excellent vibrator, and furthermore ran into the bedroom as well as the living room of appellants' house. Every inference, and what little direct evidence there was, pointed to the fact that the spike made contact with the heating duct, as the police admittedly hoped it would. Once the spike touched the heating duct, the duct became in effect a giant microphone, running through the entire house occupied by appellants. The spike was the conductor by which sounds in appellants' house were transmitted to the amplifier in the adjoining house. Conversations on both floors of appellants' house were clearly heard by the police through earphones attached to the amplifier.

Whether the police, in installing and using the electronic device, committed a technical trespass upon appellants' property is a matter which seems immaterial to me. True, the import of On Lee v. United States, 1952, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, when read in the context of conflicting opinions in the same case by the judges in the Second Circuit, United States v. On Lee, 1951, 193 F.2d 306, and the earlier Supreme Court decisions in Olmstead v. United States, 1928, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, and Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, may perhaps be that the Fourth Amendment protects one's security in the home only to the extent of barring unauthorized physical entry of a person upon the premises of another. Thus, eavesdropping of the kind which occurred here may be held not to abridge any Fourth Amendment rights. But it does violate, I think, our fundamental concept of ordered liberty, as embodied in the due process clauses of the Fifth and Fourteenth Amendments. See Irvine v. People of State of California, 1954, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561; Palko v. State of Connecticut, 1937, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288. Under a governmental system of constitutional or limited exercise of public power, ordered liberty requires that the police, like other public officials, take action against a citizen only pursuant to duly-conferred authority.

The police actions in this case are inconsistent with such a view of ordered liberty. The Government has pointed to no statutory authority for what was done, and electronic eavesdropping was surely not contemplated in common law concepts of legitimate police activity. Electronic eavesdropping today affords the police investigatory means which directly impair the right of the citizen to be free from unauthorized interference and surveillance by others. The latest contributions of modern electronics have far greater capacity for public evil than their earlier counterpart—the wiretap. Electronic devices—easily concealed and indiscriminate as to what is overheard—permit police officers to observe at will, for long periods and without detection, all the private affairs which transpire within a particular area. Such thoroughgoing and indiscriminate surveillance threatens legitimate interests in peace and security if only because the indiscreet, the idle, or the highly personal communications of innocent third parties may be overheard. And it is hardly necessary to mention the threat of electronic eavesdropping as a possible instrument

of political oppression. The Supreme Court in Irvine condemned electronic eavesdropping where police invaded the privacy of the marriage chamber. I do not think, as do my brethren, that due process has such limited application. Here, the police overheard conversations in an entire house over a period of nine days. The officers were limited only by their own patience and endurance. It is true that evidence was obtained showing these defendants to be guilty beyond a doubt of offenses under our statutes. But guilt cannot justify oppressive conduct by the police. The rights of these defendants were in my view seriously invaded.

For these reasons, I would reverse the convictions. I add that as to the other matters raised (see Points I, II and III of the majority opinion), I agree with my colleagues.